ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

MARTHA A. BOERSCH (CABN 126569)
Chief, Criminal Division

DANIEL N. KASSABIAN (CABN 215249)
Assistant United States Attorney

   450 Golden Gate Avenue, Box 36055
   San Francisco, California 94102-3495
   Telephone:   (415) 436-7034
   Facsimile:   (415) 436-7234
   daniel.kassabian@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>   v.<br><br>JAIME LIMON-GONZALEZ,<br><br>    Defendant. | CASE NOS.  CR 24-00255-YGR<br>                CR 12-00685-YGR<br><br>UNITED STATES' SENTENCING MEMORANDUM<br><br>Date:   August 1, 2024<br>Time:  2:00 pm<br>Ctrm:  1, 4th Fl<br>Judge:  The Honorable Yvonne Gonzalez Rogers |

## I.   SYNOPSIS

The United States submits this Sentencing Memorandum for defendant Jaime Limon-Gonzalez, who pleaded guilty in case no. CR 24-00255-YGR to one count of possession with intent to distribute at least 500 grams of cocaine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B)(ii), and admitted in case no. CR 12-00685-YGR to violating several terms of his supervised release.  On February 9, 2023, Mr. Limon-Gonzalez possessed 4.3 pounds of cocaine, along with drug sales paraphernalia, at one of his homes.  While they disagree on whether the Court should apply a Guidelines adjustment for obstruction of justice, the parties have agreed nonetheless to a sentence of 63 months pursuant to Fed. R. Crim. P. 11(c)(1)(C), and that any time for Mr. Limon-Gonzalez's supervised release violation run concurrently.  The government requests that the Court enter a sentence accordingly.

## II. SENTENCING GUIDELINES CALCULATION

The government agrees with the offense conduct facts as set forth in the Presentence Investigation Report (PSR). *See id.* ¶¶ 5-13. The government also asserts additional facts below, however, that demonstrate there should be a finding that Mr. Limon-Gonzalez obstructed justice, contrary to the PSR's information that there is "no information indicating the defendant impeded or obstructed." *Id.* ¶ 15. Consequently, the government asserts that Court should arrive at the following Guidelines offense level calculation—and not the one in the PSR:

    a.    Base Offense Level, U.S.S.G. § 2D1.1(a)(5), (c)(4):    24
    b.    Obstruction of Justice, U.S.S.G. § 3C1.1    +2
    c.    Acceptance of Responsibility, U.S.S.G. § 3E1.1:    - 3
    d.    Total Offense Level:    23

Because of Mr. Limon-Gonzalez's Criminal History Category (CHC) of II, *see id.* ¶ 35, he has a Guidelines range for offense level 23 and CHC II of 51-63 months of imprisonment. *See* U.S.S.G § 5A.

In the plea agreement, the government agreed to sentence of 63 months, *see id.* ¶ 3, which is the high end of Mr. Limon-Gonzalez's Guidelines.

## III. SENTENCING RECOMMENDATION

### A. Legal Standard

The Guidelines serve as "the starting point and the initial benchmark" of any sentencing process and are to be kept in mind throughout the process. *See United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008); *see also United States v. Kimbrough*, 522 U.S. 85, 108 (2007). The overarching goal of sentencing, as set forth by Congress, is for the Court to "impose a sentence sufficient, but not greater than necessary." *Carty*, 520 F.3d at 991 (citation omitted). In accomplishing that goal, the Court should consider the factors set forth under 18 U.S.C. § 3553(a), which include:

- the nature and circumstances of the offense and the history and characteristics of the defendant;

- the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

- the need for the sentence imposed to afford adequate deterrence to criminal conduct; and

- the need to avoid unwarranted sentence disparities among defendants with similar

records who have been guilty of similar conduct.

**B.     The Defendant's Instant Offense Shows His Recidivism As A Drug Dealer.**

The PSR lays out Mr. Limon-Gonzalez's offense conduct in sufficient detail such that it will not be regurgitated in full here. But the following facts that show his utter disregard for the law—despite a 10-year prison sentence as punishment and the Court's supervision to rehabilitate him—bear emphasis:

1. Mr. Limon-Gonzalez maintained a home outside of the district, in Modesto, that he kept secret from his probation officer; this is where his 4.3 pounds of cocaine was found. *See* PSR ¶¶ 8-10.

2. Mr. Limon-Gonzalez used Instagram to traffic drugs and mocked his supervision in so doing, stating in one instance that he had to deliver drugs before or after 6:00 p.m., "because at 6:15 I have to go piss with probation."—i.e., take a drug test. *Id*. ¶ 8.

3. When Mr. Limon-Gonzalez was detained upon arriving at his Modesto home, law enforcement found $14,297 in cash and three cell phones on his person—a later search of those phones revealed numerous messages of cocaine distribution. *See id*. ¶ 9.

4. After he was arrested, Mr. Limon-Gonzalez placed a series of jail calls to his family members regarding the collection of drug money. In one of the calls, Mr. Limon-Gonzalez told his son to collect "37.5 pesos" (code for $37,500) from "No Phone Tone." Mr. Limon-Gonzalez told his son that "No Phone Tone" is saved in his phone as "Quintana." Investigators later confirmed that the Instagram handle "Nophonetone" is Antonio Quintana's, who is charged in a related case, no. CR 23-00283-YGR. *See id*. ¶ 11.

**C.     Once Caught, The Defendant Sought Revenge On The Informant Who Outed Him**

After he was arrested, the U.S. Probation Office gave Mr. Limon-Gonzalez discovery for his (then alleged) supervised release violation. Unfortunately, that discovery identified the informant who, following his own arrest after being caught with significant narcotics, provided information about Mr. Limon-Gonzalez to law enforcement in December 2022. Consequently, Mr. Limon-Gonzalez made calls while he was incarcerated (i.e., jail calls), in which he identified the informant by name and shared other details from the discovery materials with his brother, Uriel Limon, and family members. Mr. Limon-Gonzalez asked his girlfriend, in one jail call, to make copies of the discovery to distribute to other family members. Also, in another jail call with a friend, Marco Antonio Ordonez-Toledo aka

Borrego (who law enforcement knows to be a drug dealer based in Yahualica, a town in the state of Jalisco, Mexico, which is the same region of Mexico that Mr. Limon-Gonzalez's family is from, and where Mr. Limon-Gonzalez is believed to have gotten his drugs from), Mr. Limon-Gonzalez was asked if he (Mr. Limon-Gonzalez) was sure about the information because Mr. Ordonez-Toledo knew a person by the informant's name and could "pay [the informant] a visit." Then Mr. Ordonez-Toledo told Mr. Limon Gonzalez that he (Mr. Ordonez-Toledo) would go visit the informant to see what the information says, to not worry, that everything is going to work out, and to let the informant "enjoy these days for now." The government asserts that, in that conversation, Mr. Ordonez-Toledo was seeking to confirm the informant's identity and assuring Mr. Limon-Gonzalez that there would be retribution taken against the informant if the informant's identity was confirmed. In another jail call, Mr. Limon-Gonzalez and his brother, Uriel Limon, talked about the money Mr. Limon-Gonzalez owed, and Uriel Limon explained that once they got the paperwork, they were going to charge the informant for the money Mr. Limon-Gonzalez owed from law enforcement's seizure of cocaine. The government asserts that, in that conversation, Uriel Limon was offering to take the paperwork to Yahualica, Mexico, where Messrs. Limon-Gonzalez and Ordonez-Toledo are from. And, in another jail call, Mr. Limon-Gonzalez told Uriel Limon that Mr. Ordonez-Toledo has also asked for a copy of the paperwork so that "they could take care of him"—i.e., the informant.

These facts demonstrate that Mr. Limon-Gonzalez took steps to harm the informant by sharing information about him with others. Based on the preponderance of that evidence, the Court should apply an Obstruction of Justice adjustment. *See* U.S.S.G. § 3C1.1. It is of no consequence that the government has no information that the informant was explicitly threatened or harmed as a consequence. The adjustment applies when: "(1) the defendant willfully obstructed or impeded, or <u>attempted</u> to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense" (emphasis added). Thus, that there were no explicit threats or harm to the informant is not dispositive because it is the defendant's actions in trying to effectuate that harm that controls. The informant was a potential witness in the case against Mr. Limon-Gonzalez. *See id.* § 3C1.1, Comment 4(A) - Examples of

Covered Conduct ("Threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so."). Here, Mr. Limon-Gonzalez attempted to "threaten, intimidate, or otherwise unlawfully influence the witness" by disclosing the informant's identity to others with the intent that they use the information to intimidate the informant. The planned intimidation was two-fold. First, Mr. Limon-Gonzalez shared the discovery orally with Mr. Ordonez-Toledo, and then worked to get him an physical (written) copy of the discovery with the knowledge that Mr. Ordonez-Toledo intended to "pay [the informant] a visit," "take care of him" such that the informant should "enjoy these days for now,"—i.e., Mr. Ordonez-Toledo comments are consistent with planning to threaten (or do worse) to the informant. Second, Mr. Limon-Gonzalez and his brother planed to use the discovery to "charge" the informant for the drug money that Mr. Limon-Gonzalez owed (and was unable to repay) as a result of his arrest and the seizure of cocaine. Even assuming "charging" meant collecting money (and not physical harm), demanding that a witness pay for money lost from illegal activity is an unlawful attempt to influence and intimidate the witness.

## IV. CONCLUSION

Mr. Limon-Gonzalez's sentence should serve as a deterrent this recalcitrant drug dealer who was caught dealing drugs while under federal supervision—and continue to engage in unlawful conduct from jail after being caught. A high end of the Guidelines sentence of 63-months provides that deterrence and is presumptively sufficient but no greater than necessary to accomplish that goal.

DATED: July 25, 2024

Respectfully submitted,

ISMAIL J. RAMSEY
United States Attorney

　　　　　　/s/
DANIEL N. KASSABIAN
Assistant United States Attorney

2077-9258-5218, v. 1